# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. CR-25-393-G |
| LETICIA ANNETTE INGRAM, | ) ) ) |
| Defendant. | ) ) |

## ORDER

Now before the Court is a Motion to Suppress (Doc. No. 21) filed through counsel by Defendant Leticia Annette Ingram. The Government has responded in opposition (Doc. No. 24). On February 2, 2026, the Court conducted an evidentiary hearing on the Motion. The Government appeared through Assistant U.S. Attorney Stephen Hoch. Defendant appeared through appointed counsel Brett Behenna. The Court heard the testimony of U.S. Drug Enforcement Administration ("DEA") Agent Matt Wyckoff, Oklahoma City Police Department ("OCPD") Officer Darion Richards, and OCPD Officer Noah Estrem.[1]

### I. Standard of Review

"The purpose of a suppression hearing is 'to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments.'" *United States v. Maurek*, 131 F. Supp. 3d 1258, 1261-62 (W.D. Okla. 2015) (quoting *United States v. Merritt*, 695 F.2d 1263, 1269 (10th Cir.

---

[1] Based on the Court's observations of the witnesses, the Court finds the testimony relied upon herein to be credible.

1982)). "'The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search.'" *Id.* at 1262 (quoting *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009)). The Government must then prove by a preponderance of the evidence that the search or seizure that occurred was lawful—e.g., that an exception to the warrant requirement existed or that the evidence sought to be suppressed was not "fruit of the poisonous tree." *See United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974); *see also United States v. Chavez*, 985 F.3d 1234, 1240 (10th Cir. 2021) ("Though the defendant bears the burden of proving whether and when the Fourth Amendment was implicated, the government then bears the burden of proving that its warrantless actions were justified by an exception." (alterations and internal quotation marks omitted)).

II.  Background

On September 8, 2025, agents with the DEA and the Oklahoma Bureau of Narcotics were surveilling a suspected drug trafficker in Oklahoma City. At around 5:25 p.m., the agents observed the suspect travel by car to a parking lot. Shortly after the suspect arrived, a dark green Chevrolet Suburban arrived and parked in the suspect's vicinity. Agents next observed a female, later identified as Defendant Leticia Annette Ingram, exit the Suburban and enter the suspect's vehicle. About two minutes later, Defendant exited the suspect's vehicle with a large brown box, which she placed in the Suburban. Both vehicles then left the parking lot.

The DEA agents believed that the box contained controlled substances. Agents followed both vehicles as they left the parking lot. A DEA agent requested that OCPD officers follow the Suburban and conduct a traffic stop after observing a traffic violation. Agent Wyckoff testified that the DEA requested OCPD's assistance in an attempt to have the OCPD's stop of the Suburban be "walled off" from any action taken by the DEA based upon a suspicion that the Suburban had been involved in a drug deal. In the course of communicating with OCPD, the DEA conveyed the suspicion that controlled substances were in the vehicle.

Around 5:48 p.m., OCPD officers drove their patrol vehicles onto southbound Interstate 235, positioning the vehicles in the flow of traffic behind the Suburban. The patrol vehicle driven by OCPD Officer Darion Richards was closest to the Suburban. The Suburban changed lanes, moving left into the center lane. Officer Richards testified that at this point he observed a traffic violation: specifically, that the Suburban's turn signal was activated simultaneously with the lane change, rather than—as required by an applicable traffic law—at least 100 feet prior to the lane change.[2] Officer Richards then moved his vehicle behind the Suburban and initiated a traffic stop.[3]

---

[2] The Government has not identified the specific traffic law at issue. Defendant does not dispute the Government's characterization of applicable law, however. The Court has previously recognized that Oklahoma law "requires that a 'vehicle shall not be moved from the lane until the driver has . . . given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his or her intention to change lanes.'" *United States v. Ramdial*, 717 F. Supp. 3d 1118, 1127 (W.D. Okla. 2024) (quoting Okla. Stat. tit. 47, § 11-309(2)), *aff'd*, No. 24-6213, 2025 WL 2682624 (10th Cir. Sept. 19, 2025).

[3] The OCPD officers in pursuit of the Suburban were communicating via radio with DEA agents who, reportedly, were already on the highway. Some such communications were captured by the OCPD officers' dashcam videos, including a statement apparently made

The Suburban pulled over on the interstate shoulder between Northwest 23rd Street and Northwest 36th Street.  Officer Richards approached the Suburban and encountered Defendant, the vehicle's sole occupant.  He asked Defendant for her driver's license, but she said she did not have it on her.  Officer Richards then asked Defendant to exit the car, which she did.  He handcuffed her.  Defendant was asked whether there were any drugs in her vehicle.  In Officer Richards' assessment, Defendant would not answer the question and appeared nervous and evasive.

During this exchange, Defendant stated that the vehicle was not hers and that she did not know whose it was—she was just driving it.  Shortly thereafter, law enforcement learned that Defendant's driver's license was suspended and that she was driving a vehicle with a fake paper license tag over a real license plate.  Defendant was arrested for driving with a suspended driver's license and ultimately placed in an OCPD vehicle.

A wrecker was called to the scene to impound the Suburban.  When the wrecker arrived, OCPD officers began inventorying the contents of the Suburban.  Shortly after beginning the inventory search, OCPD Officer Noah Estrem and others located a brown

---

by a DEA agent at the time the Suburban changed lanes. *See* Def.'s Ex. 1, Woodall Dashcam at 1:33-1:39.  The recorded audio is difficult to discern and the parties disagree as to what was said. Acknowledging room for disagreement, the Court finds that the DEA agent stated, in relevant part: ". . . failure to signal.  There's a traffic violation."  Defense counsel, suggesting that Officer Richards did not actually see a late signal but was merely acting on the basis of what he was told by the DEA, argues that the DEA agent stated, "Failure to signal is your traffic violation."  The Court does not find this distinction material to the determinations made herein.  Officer Richards testified that he personally observed the tardy signal.  Even if defense counsel's interpretation of the DEA agent's statement were correct, it does not follow that Officer Richards did not independently observe the traffic violation.

cardboard box sitting on the back seat.  The box contained a substance that later field-tested positive for the presence of methamphetamine.

Defendant was indicted on one count of possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).  *See* Indictment (Doc. No. 14).

### III.   Discussion

Defendant argues that the "physical evidence and oral statements" obtained by law enforcement officers on September 8, 2025, must be suppressed because both the traffic stop and inventory search of the Suburban were unlawful.  Def.'s Mot. to Suppress at 1-4.  The Government responds that both the initial stop and resulting search were conducted pursuant to and in compliance with the Fourth Amendment, such that the relevant evidence and statements are not subject to exclusion.  *See* Gov't's Resp. at 4-10.

#### *A. The Traffic Stop*

Defendant contends that Officer Richards did not actually observe a traffic violation by Defendant and so the traffic stop of the Suburban was infirm from its inception.  *See* Def.'s Mot. to Suppress at 3.  In support, Defendant points to the dashcam footage from Officer Richards' police vehicle and from another OCPD vehicle that was with Officer Richards on Interstate 235.  *See* Woodall Dashcam; Gov't's Ex. 1, Richards Dashcam.  Officer Richards' dashcam footage commences when his patrol car merges onto Interstate 235.  Clearly visible at the outset of the video is the green Suburban changing from one lane to another ahead of Officer Richards' vehicle.  *See* Richards Dashcam at 00:00-00:05.

The video exhibits do not capture when, if at all, the Suburban's turn signal was activated.  *See id*.; Woodall Dashcam at 01:30-01:40. At the evidentiary hearing, Officer

Richards testified that he saw the Suburban change lanes and that the signal was activated simultaneously with the lane change. Officer Richards further testified that he issued a citation to Defendant for failing to signal 100 feet prior to the lane change.[4]

A traffic stop is a seizure under the Fourth Amendment "and is subject to review for reasonableness." *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020). "To be reasonable, a traffic stop must be justified at its inception and, in general, the officer's actions during the stop must be reasonably related in scope to the mission of the stop itself." *Id.* (internal quotation marks omitted). Whether a traffic stop is justified at its inception depends upon "the totality of the circumstances." *United States v. Salazar*, 609 F.3d 1059, 1068 (10th Cir. 2010).

The Tenth Circuit has explained that "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995); *see also United States v. Ingram*, 721 F. App'x 811, 816 (10th Cir. 2018) ("If police officers witness a traffic violation, then the traffic stop is justified at its inception.").

> Further, the constitutionality of the stop does not depend on whether the driver did, in fact, commit a traffic violation. The standard is reasonable suspicion of wrongdoing. If an officer reasonably thinks he saw a driver commit a traffic infraction, then that is enough to pull him over. *See, e.g., United States v. Reyes*, 202 F. Supp. 3d 1209, 1213 (D. Kan. 2016) (explaining that the "propriety of a stop does not depend on whether the suspect is actually guilty of committing a traffic offense; rather, the relevant question is whether it was reasonable for the officers to believe the offense had been committed") (citing *United States v. Eckhart*, 569 F.3d 1263, 1271

---

[4] Defendant's counsel represented that the citation was later dismissed.

(10th Cir. 2009) and *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

*Ramdial*, 717 F. Supp. 3d at 1126-27.

The Court credits Officer Richards' unequivocal testimony, which is not contradicted by any video or other evidence, and finds that it is "sufficient to meet the low reasonable suspicion bar." *United States v. Anderson*, 62 F.4th 1260, 1267 (10th Cir. 2023). The possibility that a few seconds' additional dashcam footage might show more of the event does not undermine or discredit Officer Richards' sworn testimony as to what he observed. Further, while it is clear from the evidence that the DEA agents had a strong interest in learning what was in the cardboard box in the Suburban, and did not refrain from expressing that interest to the OCPD officers, the fact of an additional motive for stopping Defendant is immaterial in light of Officer Richards' reasonable suspicion of a traffic violation. Although Officer Richards knew of the DEA's suspicions, it is "irrelevant" for Fourth Amendment purposes "that the officer may have had other subjective motives for stopping the vehicle." *Botero-Ospina*, 71 F.3d at 787.

The Court therefore concludes that the traffic stop was justified at its inception, as "the facts available to" Officer Richards "warranted an officer of reasonable caution in believing the action taken was appropriate." *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011) (internal quotation marks omitted).[5]

---

[5] The Court therefore need not consider the parties' alternative arguments regarding whether reasonable suspicion or probable cause justified the traffic stop based upon the DEA agents' observations of events at the parking lot that arguably were consistent with drug trafficking.

7

### B. The Inventory Search

Defendant challenges the inventory search of the Suburban as not performed "for legitimate non-pretextual reasons pursuant to [the OCPD officers'] community caretaker responsibilities." Def.'s Mot. to Suppress at 4.

#### 1. Relevant Standards

"One exception to the warrant requirement is a search or seizure conducted pursuant to police officers' 'community-caretaking functions.'" *United States v. Venezia*, 995 F.3d 1170, 1175 (10th Cir. 2021).

> This exception allows law enforcement to impound an automobile and, in connection with the impoundment, inventory the vehicle's contents. Such an impoundment, however, must be based on something other than suspicion of evidence of criminal activity, such as protecting public safety and promoting the efficient movement of traffic.

*United States v. Ramos*, 88 F.4th 862, 867 (10th Cir. 2023) (citation and internal quotation marks omitted).

An inventory search is reasonable "only if conducted according to standardized procedures." *United States v. Tueller*, 349 F.3d 1239, 1243 (10th Cir. 2003) (internal quotation marks omitted). In addition, the inventory search "must be justified by the administrative purposes of such searches," rather than being "investigatory in nature." *Id.* (internal quotation marks omitted). "[A]n inventory search may be justified by a legitimate inventory purpose despite an officer's subjective desire to uncover criminal evidence," however. *United States v. Cecala*, No. 99-4049, 2000 WL 18948, at *2 (10th Cir. Jan. 12, 2000).

*2. Discussion*

The undisputed record reflects that Defendant being placed under arrest left the Suburban unoccupied on the shoulder of Interstate 235. The impoundment of the Suburban was therefore authorized by OCPD procedure, which prescribes that "[v]ehicles may be impounded when . . . [t]he driver is arrested . . . under circumstances which leave[] or will leave a vehicle unattended on any street or highway." Def.'s Ex. 2, *OCPD Operations Manual* § 5-405.2(J); *see also South Dakota v. Opperman*, 428 U.S. 364, 369 (1976) ("The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.").

As for the inventory search, such a search was likewise authorized by the *OCPD Operations Manual*, which prescribes:

> All vehicles impounded will be subjected to a routine custodial inventory. The inventory will be conducted by the impounding officer at the scene of the impoundment (whenever this can be reasonably accomplished) in the presence of the wrecker driver. Contents of the vehicle will be recorded in the appropriate space provided on the impound report.

*OCPD Operations Manual* § 5-405.4; *see also* Gov't's Ex. 5, Impound Report.

As support for her contention that this was an unlawful investigative search, Defendant points to Officer Estrem's alleged failure to fully comply with OCPD procedures in completing the inventory search and associated paperwork, as well as the fact that the wrecker driver was in the cab of the wrecker for much of the time the inventory search was being conducted. The Court disagrees that the omissions and deviations alleged by Defendant would make the inventory search conducted here improper and illegal. For example, Officer Estrem testified that he understood § 5-405.4's requirement that the

9

search be conducted "in the presence of the wrecker driver" to mean that the officer must wait for the wrecker driver to arrive before beginning the search, which Officer Estrem did, and that the wrecker driver merely needs to be "on the scene" in order to fulfill § 5-405.4's requirement that he be "present." Even if Defendant has reasonable grounds to criticize this interpretation or the manner in which Officer Estrem completed the Impound Report, it is indisputable that (a) §§ 5-405.2(J) and 5-405.4 plainly authorized OCPD officers in these circumstances to inventory and impound the Suburban and (b) Officer Estrem carefully and thoroughly examined the contents of the Suburban in a manner consistent with the administrative purpose of recording valuable property and identifying dangers. Based on the evidence presented, the Court finds that OCPD conducted a proper inventory search pursuant to a proper purpose. The alleged missteps in OCPD's execution of § 5-405.4, or other relevant OCPD procedures, are not sufficient to establish that this was "[a]n inventory search undertaken in bad faith or for the *sole* purpose of investigation." *Cecala*, 2000 WL 18948, at *2 (internal quotation marks omitted).[6]

Based on the same view of the evidence, the Court rejects the suggestion that the inventory search of the Suburban was merely "a ruse for a general rummaging in order to discover incriminating evidence," in violation of the Fourth Amendment. *Florida v. Wells*, 495 U.S. 1, 4 (1990). Although, again, the evidence shows that some OCPD officers on

---

[6] The Court agrees with the Government that suppression of evidence based upon minor deviations from a law enforcement agency's policies for inventorying and impounding a vehicle would be inconsistent with the purpose of the exclusionary rule, which is to exclude evidence only when police conduct is "sufficiently deliberate that exclusion can meaningfully deter it" and "sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009).

the scene were aware that the DEA suspected that controlled substances were present in the Suburban, "an inventory search may be justified by a legitimate inventory purpose despite an officer's subjective desire to uncover criminal evidence." *Cecala*, 2000 WL 18948, at *2. That justification was present here.[7]

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. No. 21) is DENIED.

IT IS SO ORDERED this 6th day of February, 2026.

_____
CHARLES B. GOODWIN
United States District Judge

---

[7] Based upon this determination, the Court need not address the parties' alternative arguments as to whether the officers had probable cause to conduct the search based upon a belief that the vehicle contained contraband or evidence of a crime.